IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| LLOYD J. MAY, | ) | |
| Plaintiff, | ) | Civil Action No. 5:14cv00010 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By:  Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Lloyd J. May asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–422. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 17. Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's final decision is not supported by substantial evidence in the record. The decision will be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The claimant bears the burden of proof at steps one through four.

*Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

May filed for DIB on February 23, 2011. *See* Administrative Record ("R.") 155. He was 43 years old, *id.*, and had worked for many years in a poultry plant, R. 168. May alleged disability beginning January 10, 2011, because of nerve damage in his legs and "inoperable discs in [his] spine." R. 167. After the state agency twice denied his application, R. 79, 91, May appeared with counsel at a hearing before an ALJ on September 18, 2012, R. 28. He testified about his chronic musculoskeletal pain and the limitations that pain caused in his daily activities. *See* R. 39–56. A vocational expert ("VE") also testified as to May's ability to return to his past work or to perform other work existing in the economy. *See* R. 56–66.

The ALJ denied May's application in a written decision dated November 29, 2012. *See* R. 10–23. He found that May suffered from a severe back disorder and obesity, "at least in combination," R. 12, but that the medical impairment(s) did not meet or equal a listing, R. 13. The ALJ next determined that May had the residual functional capacity ("RFC") to perform light work.[1] R. 14. Specifically, he found that May could occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; sit, stand, and walk for about six hours each in an eight-hour workday; occasionally stoop, crawl, or climb ladders, ropes, and scaffolding; and frequently perform "other postural activities" like climbing stairs and ramps, kneeling, and crouching. *Id.* The ALJ noted that this RFC ruled out May's return to his past relevant work as a poultry

---

[1] "Light work" involves lifting no more than twenty pounds at a time, but frequently lifting or carrying objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet those lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

3

vaccinator and truck washer. R. 21. Finally, relying on the VE's testimony, the ALJ concluded that May was not disabled after January 10, 2011, because he still could perform certain jobs available nationally or in Virginia, such as folder, sorter, or cleaner. R. 22. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

### III. Discussion

May's overarching objection is that substantial evidence does not support the ALJ's RFC determination. *See generally* Pl. Br. 5–18, ECF No. 29. A claimant's RFC is the most he can do on a regular and continuing basis despite his impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence and the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). May argues that the ALJ erred in evaluating medical opinions from a treating physician and a state-agency medical consultant and in weighing May's credibility. *See* Pl. Br. 7–14, 14–18.

### A.    Medical Opinions

"Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities.[2] 20 C.F.R. § 404.1527(a)(2). The regulations classify medical opinions by their source:

---

[2] They are distinct from medical-source opinions on issues reserved to the Commissioner, such as the claimant's RFC or whether the claimant is disabled. 20 C.F.R. §§ 404.1527(d)(1), 404.1545(a). The ALJ must consider these opinions as he would any relevant evidence, but he need not accord "any special significance" to the source's medical qualifications. *Id.* § 404.1527(d)(3); *see also Morgan v. Barnhart*, 142 F. App'x 716, 722 (4th Cir. 2005) ("The ALJ

those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See* 20 C.F.R. § 404.1527(c).

A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527(c)(2). If the ALJ finds that a treating-source medical opinion is not entitled to controlling weight, then he must weigh the opinion in light of certain factors including the source's medical specialty and familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); 20 C.F.R. § 404.1527(c)(2). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. § 404.1527(c), (e)(2).

The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013), and he must give "good reasons" for the weight assigned to any treating-source medical opinion, 20 C.F.R. § 404.1527(c)(2); *Mastro*, 270 F.3d at 178 (the ALJ may reject a treating-source medical opinion "in the face of persuasive contrary evidence" only if he gives "specific and legitimate reasons" for doing so). His "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96-8p, at *5).

---

is not free . . . simply to ignore a treating physician's legal conclusions, but must instead 'evaluate all the evidence in the case record to determine the extent to which [the conclusions are] supported by the record.'" (quoting SSR 96-5p, at *3)).

1.      *Medical Evidence & Opinions*

May experienced episodic back pain for many years until summer 2010. R. 245. In July 2010, he noticed the pain getting worse with sudden onset radiating pain, numbness, and tingling in the left leg. R. 307. On July 30, May complained to his primary-care provider's office of severe lower-back and leg pain. *Id.* On exam, a nurse observed only that May's spinal range of motion was "limited" by pain. R. 308. She recommended that May "avoid heavy lifting" and prescribed heat, physical therapy, exercise, and Vicodin for short-term relief. R. 309. May returned on August 6, 2010, complaining of "fairly severe" radiating lower-back pain, as well as some numbness in both legs. R. 305. He reported that the Vicodin and physical therapy did not help. *See id.* On exam, Shawn Lepley, M.D., noted "pain to palpation in the lower paraspinous lumbar muscles." *Id.* He diagnosed sciatica and lumbago, prescribed a Prednisone taper, and ordered X-rays and an MRI of May's spine. R. 305–06. The X-rays were unremarkable. R. 304.

On August 26, 2010, Matthew Blurton, M.D., opined that the MRI showed a "mild broad-based disc bulge without associated neural foraminal narrowing" or other "complicating features" at L4-5. R. 263–64. Dr. Blurton also identified a "broad-based disc bulge with small central disc protrusion at L5-S1 [and] very slight narrowing of the right neural foramen at this level." R. 264. A few days later, Dr. Lepley opined that the MRI showed degenerative disc disease in the lumbar spine "and broad based herniated discs but no focal neurologic compression." R. 298–99. Dr. Lepley recommended physical therapy and weight loss to manage May's pain because he saw "no surgical problems as of yet based on [the] MRI." R. 299.

May established care at Hess Orthopedics on October 1, 2010. R. 248. He told physician's assistant Justin Nolen that the pain in his back and left leg was starting to interfere with his work and daily activities, especially those requiring "prolonged weight bearing." R. 245.

6

On exam, Nolen noted that May experienced tenderness to palpation over the lumbar spine and "reproduction of his lower back pain" when flexing forward, extending, rotating, and bending sideways at the waist. *Id.* May had full strength in both legs, walked normally, and could stand on his toes, heels, and one leg without difficulty. R. 245–46. May asked for a work-release note that restricted his lifting to 15 pounds, which Nolen provided.[3] *See* R. 246, 247. Nolen also recommended that May undergo epidural injections to supplement the Percocet that another doctor prescribed. R. 246.

May returned to Nolen's clinic on October 19 and November 5, 2010, complaining of persistent lower-back and left-leg pain. *See* R. 242, 243. On both visits, Nolen observed that May walked with a "relatively normal gait," had "good" strength in both legs, and "maintain[ed] good overall active [range of motion] of the lumbar spine," albeit with "some reproduction of his pain [on] flexion and extension." *Id.* Nolen referred May to Glenn Deputy, M.D., for diagnostic testing on November 10, 2010, after May's symptoms did not respond to two epidural injections. *See* R. 226, 242. Dr. Deputy opined that a needle EMG was abnormal "with findings suggestive of nerve root irritation on the left at S1 and probably on the right at L5." R. 226. A nerve conduction study was normal without evidence of neuropathy. *Id.*

May also underwent a discogram[4] and CT scan on November 19. *See* R. 250–53. Andrew Wagner, M.D., opined that the CT scan showed "mild" annular derangement on the right at L3-4, bilateral posterolateral annular tears at L4-5, greater on the right than the left, and posterior disc

---

[3] The note did not restrict May's ability to sit, stand, walk, or engage in postural activities. R. 247. Nolen also provided similar work-release notes on October 19 and December 28, 2010. *See* R. 238, 244.

[4] A discogram is an invasive procedure used to determine whether an abnormal disc is causing a person's persistent back pain. *See* Mayo Clinic, *Discogram*, Jan. 9, 2015, http://www.mayoclinic.org/tests-procedures/discogram/basics/definition/prc-20013848. Physicians can use information about the pain a person experienced upon injection of a particular disc to help pinpoint the pain's source. *See id.*

7

extrusion paracentral to the left at L5-S1 filling with contrast with diffuse annular derangement of the disc. R. 250. Dr. Wagner also noted that during the discogram May reported pain upon injection of his "almost normal" L3-4 disc, but not upon injection of his "severely degenerated" L5-S1 disc. R. 253. Robert Kime, M.D., did not think May was a surgical candidate based on these "nonconcordant" discogram results. R. 240, 242.

May visited the Virginia Brain & Spine Center on December 20, 2010, complaining of "constant" radiating back pain and weakness in his left leg. R. 286–87. On exam, James Chadduck, M.D., and physician's assistant Dennis Dolsen noted that May's muscle strength and tone were slightly decreased in his left leg and that he reported pain when extending his spine. R. 287. Dr. Chadduck opined that May's recent diagnostic tests showed "some spondylosis," but that he was "not sure surgery [was] the right option." *Id.* He recommended physical therapy and non-steroidal anti-inflammatory drugs ("NSAID") to manage May's pain. After examining May again on March 21, 2011, Dr. Chadduck also advised against surgery and recommended "conservative" pain management options. R. 284.

On February 15, 2011, Dr. Lepley referred May to Gregory Helm, M.D., Ph.D., at the University of Virginia for another neurosurgery consult. *See* R. 274–77, 292. May told Dr. Helm that physical therapy and epidural injections had not relieved his severe radiating back and leg pain. R. 276, 277. On exam, Dr. Helm observed that May had "good strength in his lower extremities" and was not myelopathic. R. 274. Dr. Helm also opined that the August 2010 MRI of May's spine showed "some mild degenerative changes, but no obvious surgical lesions." *Id.* He recommended that May take Neurontin for pain. *Id.*

May returned to Dr. Lepley's office on February 18 and March 8, 2011. R. 290, 329. Dr. Lepley did not note any abnormal physical findings during these visits. *See* R. 290–91, 328–31.

8

On March 8, Dr. Lepley added Fentanyl patches for pain and told May to follow up in three months. *Id.* May returned on April 8 complaining of persistent back pain. R. 321. May also asked Dr. Lepley to "reconfirm" the severity of his condition so that he could stay on his former employer's short-term disability plan until his coverage expired in July. *Id.*

Dr. Lepley noted that two neurosurgeons had "confirmed the severity" of May's degenerative disc "disease but state[d] that he is not a surgical candidate as it would only worsen his back condition." *Id.* He said that physical therapy, steroid injections, NSAIDs, and muscle relaxants had not helped, but "ongoing" narcotic pain medications allowed May to "maintain moderate discomfort." *Id.* On exam, Dr. Lepley observed that May could not "flex more than 45 degrees at the waist and [could] extend less than 5 percent." R. 322. May also experienced pain to palpation of his lumbar spine and paraspinous muscles. *Id.* Dr. Lepley recommended that May continue his medications and apply for short-term disability.

On May 25, 2011, state-agency medical consultant William Amos, M.D., reviewed May's medical records available through May 19, 2011. *See* R. 70–75. He opined that May could stand and walk for about six hours in an eight-hour workday; sit for at least six hours "on a sustained basis"; occasionally lift, carry, push, or pull twenty pounds; frequently lift, carry, push, or pull ten pounds; occasionally stoop, crawl, or climb ladders, ropes, and scaffolding; and frequently kneel, crouch, or climb stairs and ramps. R. 75. Dr. Amos also explained that May's severe degenerative disc disease was not disabling because he could "ambulate normally [without] assistive devices," had "good strength" in his lower extremities, and "several treating sources" said that "the severity of his condition d[id] not warrant surgery." R. 73.

In June 2011, Dr. Chadduck referred May to Blue Ridge Pain Treatment to determine the source of May's "constant" lower-extremity pain, weakness, and numbness. R. 354. Physician's

assistant Robert Burke observed that May was in "obvious discomfort at rest and when moving about the exam room." R. 355. May walked with an antalgic gait while using a walker. *Id.* Burke also noted that May had reduced strength (4/5 and 4+/5) and range of motion in both lower extremities and experienced pain when extending, flexing, and rotating his lumbar spine. *See id.* He and John Sherry, M.D., diagnosed lumbosacral neuritis, spinal stenosis, degenerative disc disease, and lumbar spondylosis. R. 356.

May returned for a follow-up appointment with Dr. Sherry on June 29, 2011. R. 357–59. On exam, Dr. Sherry observed that May walked with a "moderately antalgic" gait and experienced "moderate" tenderness to palpation at L5-S1. R. 358. Dr. Sherry noted that May's pain had not responded to "more conservative modalities of treatment" and that he was in too much pain to undergo physical therapy or other "mobilization/manipulation" treatments. *Id.* But he also acknowledged the absence of objective "'red flag' conditions" or "obvious non-facet pain pathology that would explain [May's] symptom(s)." *Id.* Dr. Sherry performed bilateral median branch block injections and instructed May to follow up in one month. *Id.*

On July 20, May told Burke that the nerve blocks did not provide even "temporary" relief. R. 361. Burke observed that May walked with a "mildly antalgic" gait and experienced "mild" tenderness to palpation of his lumbosacral spine. *Id.* He recommended that May undergo sacroiliac joint injections to supplement his Oxycodone, Neurontin, and Fentanyl. *See id.* Dr. Sherry performed that procedure on August 8, 2011. R. 374. He observed that May experienced "concordant discomfort" upon injection of both joints. *Id.* On September 21, May told Burke that the injections provided no relief. R. 371. May agreed to schedule a left lumbosacral epidural injection even though earlier injections reportedly did not help. *See id.* The next day, May told

10

Dr. Lepley that he would not return to Dr. Sherry's clinic because "he was told that his [primary-care provider] can manage his pain just as effectively as they can." R. 394.

May saw Dr. Lepley six times between July 2011 and June 2012. *See* R. 347–49 (July 18, 2011); R. 394–97 (Sept. 22, 2011); R. 382–85 (Oct. 20, 2011); R. 418–20 (Feb. 14, 2012); R. 402–04 (May 22, 2012); R. 413–16 (May 16, 2012). In February 2012, May visited Dr. Lepley's office so he could fill out new disability forms. R. 419. On exam, Dr. Lepley observed that May had a "very difficult" time walking and had "to use [his] hands to get up on [the] table and out of a chair." R. 420. Dr. Lepley did not note any abnormal findings on physical exams in July, September, and October 2011, or May 2012. *See* R. 348, 384, 396, 404, 415. On those visits, Dr. Lepley instructed May to continue his medications and return in three months.

On September 14, 2011, state-agency medical consultant Leslie Ellwood, M.D., reviewed May's updated medical records available through September 7, 2011. *See* R. 81–87. He agreed with Dr. Amos's earlier assessment except for the six-hour restriction on standing and walking. *See* R. 86. Dr. Ellwood opined that May could stand and walk for only four hours in an eight-hour workday because May "still reported a great deal of pain and tenderness" despite having normal strength and range of motion. *Id.*

On October 20, 2011, Dr. Lepley filled out a check-box form listing May's work-related restrictions beginning January 10, 2011. R. 380. Dr. Lepley opined that May could sit, stand, and walk for less than one hour each during an eight-hour workday; lift up to five pounds at one time; and never "stoop (bend [his] back at the waist), squat (bend at the knees), crawl, or climb (stairs, ladders)." *Id.* He also opined that May's severe back pain would cause him to miss more than three days of work each month. *Id.* Dr. Lepley completed a more detailed Lumbar Spine RFC Questionnaire on February 14, 2012. *See* R. 378–79. He opined that May's August 2010

11

MRI showed "severe disc herniations" at L4-5 and L5-S1, which was likely the source of his severe chronic back pain. R. 378. Dr. Lepley also noted that May's pain had not responded to "multiple courses of physical therapy [and] pain management," and that two neurosurgeons had opined that May was "not a good candidate for surgery," *id.*, because "he would simply not benefit," R. 379. Finally, Dr. Lepley opined that May should use an assistive device to help him walk even if not "clinically required."

   2.   *The ALJ's Findings*

   The ALJ "generally adopted" Drs. Amos and Ellwood's "assessments for light work because they [were] consistent with the other credible evidence" in May's record. R. 20. He gave "little weight" to Dr. Ellwood's opinion that May could stand and walk for four hours, however, because that restriction was "not consistent with the medical evidence of record, including [May's] generally unremarkable physical examinations" during the relevant period. R. 21. Instead, the ALJ adopted Dr. Amos's opinion that May could stand and walk for about six hours in an eight-hour workday. R. 14. The ALJ's RFC determination also incorporates both state-agency physicians' opinions that May could sit for at least six hours; occasionally lift twenty pounds and frequently lift ten pounds; occasionally stoop, crawl, or climb ladders; and frequently kneel, crouch, or climb stairs. *See* R. 14, 75, 86.

   The ALJ rejected Dr. Lepley's "conclusory opinions that [May was] permanently disabled and unable to sit, stand, or walk 2 hours in an 8-hour workday." R. 20. He explained that these were

>      opinions on an issue of disability reserved to the Commissioner . . . and [were] not
>      supported by the longitudinal record with its limited findings and routine and
>      conservative treatment, including [Dr. Lepley's] own treatment notes (which
>      reflect no abnormal musculoskeletal signs on physical examinations unless they
>      were discussing disability during the appointment). . . . Dr. Lepley indicated that a
>      basis for his opinion was the claimant's August 2010 lumbar MRI, which showed

'severe' disc herniations. However, Dr. Helm with the UVA Neurosurgery Clinic advised Dr. Lepley in a February 15, 2011, letter that his review of the claimant's August 2010 MRI showed some 'mild' degenerative changes, but no obvious surgical lesions. . . . The assessments prepared by Dr. Lepley are more based on the claimant's reported symptoms and limitations[] rather than on objective findings and diagnostic test results.

*Id.* The ALJ also explained that he rejected Dr. Lepley's opinion that May could never stoop—i.e., bend his back at the waist—because "the vocational expert testified that if [May] was truly unable to bend at the waist, he would be totally unable to sit" and May "acknowledged during the hearing that he could at least sit for 15–20 minutes at a time and did sit at his hearing." *Id.*

   3.    *Analysis*

   May argues that the ALJ did not properly weigh Dr. Lepley's opinion in general or Dr. Ellwood's standing/walking restriction in particular. *See generally* Pl. Br. 7–14. May objects that the ALJ did not "specify which evidence contradicted" Dr. Ellwood's restriction, but only "vaguely" alluded to May's "generally unremarkable physical examinations" during the relevant period. *Id.* at 13. This argument ignores the ALJ's earlier discussion of multiple physical exams conducted between November 2010 and May 2012, R. 15–19, which indeed revealed few objective abnormalities related to May's station and gait, R. 242, 274, 287, 291, 292, 322, 328–31, 348, 355, 358, 361, 384, 396, 404, 415. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (per curiam) ("[T]he ALJ need only review medical evidence once in his decision."). Further, Dr. Ellwood based his restriction on May's "reports [of] pain and tenderness" even though physical exams consistently revealed normal strength and range of motion. R. 86. These are legitimate reasons for the ALJ to discount a non-examining physician's opinion. 20 C.F.R. § 404.1527(c)(3)–(4), (e)(2). Accordingly, I find no error with the ALJ's decision to give little weight to this part of Dr. Ellwood's functional assessment.

13

I also find no error with the ALJ's decision to reject Dr. Lepley's opinion that May was permanently disabled. The ALJ explained that this opinion, which addresses an issue reserved to the Commissioner, seemed "more based on [May's] reported symptoms and limitations[] rather than on objective findings and test results." R. 20. Indeed, Dr. Lepley expressly attributed this part of his opinion to May's contemporaneous comment that "he just cannot work with pain all of the time." R. 291. Dr. Lepley's explanation provided a legitimate basis for the ALJ to reject his legal conclusion to the extent that it conflicted with other evidence in the record, including Dr. Lepley's own treatment notes. *See Craig*, 76 F.3d at 590. The ALJ correctly found that those notes reflect generally unremarkable physical exams unless Dr. Lepley and May were discussing disability during the appointment. *Compare* R. 290–91, 305, 328–31, 348, 384, 396, 404, 415, *with* R. 322, 420.

The ALJ's analysis of Dr. Lepley's functional assessment presents a closer question. The ALJ improperly characterized the physician's opinion of May's physical limitations as an "opinion[] on an issue of disability reserved to the Commissioner." R. 20. The RFC determination is an administrative finding reserved to the Commissioner, 20 C.F.R. §§ 404.1545(a), 404.1546(c), but a doctor's "medical opinion" can address a claimant's functional limitations and abilities, 20 C.F.R. § 404.1527(a)(2). Still, the ALJ clearly "concluded that [Dr. Lepley's] opinion was not consistent with the record or supported by the medical evidence, which are appropriate reasons" to discount a treating physician's medical opinion. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam); 20 C.F.R. § 404.1527(c)(2). The ALJ also considered Dr. Lepley's medical specialty and familiarity with May, the weight of the evidence supporting his opinion, and the opinion's consistency with the

14

record in explaining why he rejected Dr. Lepley's "assessments" in their entirety, R. 16–18, 20. *See Burch*, 9 F. App'x at 259; 20 C.F.R. § 404.1527(c)(2)–(5).

Not all of the ALJ's stated reasons withstand scrutiny. For example, the ALJ explained that he rejected Dr. Lepley's stooping restriction because the VE "testified that if [May] was truly unable to bend at the waist, he would be totally unable to sit"[5] and May testified "that he could at least sit for 15–20 minutes at a time." R. 20. The ALJ can discount a treating physician's opinion because it conflicts with the claimant's admitted abilities. *Chestnut v. Colvin*, 4:13cv8, 2014 WL 2967914, at *4 (W.D. Va. June 30, 2014) (Kiser, J.). Here, however, the ALJ's reasoning relies on the false assumption that sitting and stooping involve similar physical capacities. *See* SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983) ("By its very nature, work performed primarily in a seated position entails no significant stooping.").

The agency's interpretive rules distinguish between sitting, an exertional or "strength demand," and stooping, a nonexertional "postural activity." SSR 96-8p, at *5–6. To stoop means to "bend the spine alone" or to "bend[] the body downward and forward by bending the spine at the waist," as might be required when lifting objects from below one's waist. SSR 85-15, 1985 WL 56857, at *2, *7 (Jan. 1, 1985). The agency's rules also recognize that there may be cases where a person can sit for several hours at a time but cannot bend down and forward at the waist:

---

[5]

| ALJ: | Now, is it also true if an individual cannot stoop, that is bend at the waist, they cannot – they would not be able to sit at all? |
|---|---|
| VE: | I think – I believe that's true, your honor. |
| ALJ: | And basically they would be – |
| VE: | Bend down and forward at the waist. |
| ALJ: | Yeah. And that's – and another way to say it would be essentially limited to the prone position if they can. |
| VE: | That's correct. |

R. 63. The "prone position" means that the body is lying flat with the face downwards. *Oxford Concise Medical Dictionary* 600 (8th ed. 2010).

15

> An ability to stoop occasionally . . . is required in most unskilled sedentary occupations. A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but the restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.

SSR 96-9p, 1996 WL 374185, at *8 (July 2, 1996). The ALJ may rely on a VE's testimony to determine whether there are jobs that May can perform assuming he is limited to less than occasional stooping. *See id.*; *Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002). Here, the ALJ impermissibly relied on the VE's lay testimony to discredit Dr. Lepley's medical opinion that May was in fact so limited.[6]

That error aside, I find that the record supports the ALJ's other reasons for rejecting Dr. Lepley's opinion. The ALJ explained that the opinion seemed "more based on [May's] reported symptoms and limitations" than on physical exams and diagnostic tests, was inconsistent with May's "routine and conservative treatment," and was not supported by Dr. Lepley's own treatment notes documenting mostly "limited findings" on physical exams. R. 20. "Such factors provide specific and legitimate grounds to reject a treating physician's opinion in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178; *see, e.g.*, *Bishop*, 583 F. App'x at 67.

---

[6] The ALJ's RFC determination incorporates Drs. Amos and Ellwood's opinions that May could stoop occasionally, R. 14, 75, 86, which means that May is limited to "no more than about" two hours of stooping in an eight-hour workday, SSR 96-9p, at *3. An ALJ can rely on a non-examining physician's opinion when it is consistent with the record. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984); *see also Radford*, 734 F.3d at 295 (citing *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (holding that a non-examining physician's opinion cannot by itself constitute substantial evidence)). The ALJ found that Drs. Amos and Ellwood's "assessments for light work . . . [were] consistent with the other credible evidence of record," R. 20, but he did not identify that evidence or explain how it was consistent with the reviewers' opinions of May's postural limitations. On remand, the Commissioner will have another chance to explain how specific medical facts and nonmedical evidence support "each conclusion" in her RFC determination. *Mascio*, 780 F.3d at 636; *see* 20 C.F.R. § 404.983.

16

May objects to the ALJ's characterization of his treatment as "routine and conservative" because, according to May, two neurosurgeons said that more aggressive treatment, such as surgery, would only make his back worse. *See* Pl. Br. 7–8. The record contains no such medical opinion. On the contrary, it contains several physicians' opinions that "the severity of [May's] condition d[id] not warrant surgery." R. 73, 85 (Drs. Amos and Ellwood); *accord* R. 240, 242, 274, 284, 287, 290, 299 (Drs. Kime, Helm, Chadduck, and Lepley). Several examining physicians also agreed that May's chronic back pain could be managed "conservatively," R. 284, with medication, injections, physical therapy, and weight loss. *See, e.g.*, R. 240, 242, 274, 284, 287, 299. This evidence supports the ALJ's finding that May's treatment history undermined Dr. Lepley's opinion that May suffers from debilitating, inoperable degenerative disc disease. *See Bishop*, 583 F. App'x at 67; *Gill v. Astrue*, No. 3:11cv85, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012) (noting that there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment").

May also objects to the ALJ's choice between Drs. Lepley and Helm's interpretations of his August 2010 MRI. *See* Pl. Br. 8–9. In February 2011, Dr. Helm wrote a letter to Dr. Lepley in which he noted that this MRI showed "some mild degenerative changes." R. 274. A year later, Dr. Lepley opined that the MRI showed "severe disc herniations." R. 378. The ALJ credited Dr. Helm's opinion, which he found to be inconsistent with Dr. Lepley's opinion. *See* R. 20, 21. Perhaps the ALJ should have explained this finding in greater detail given that Dr. Helm did not mention "herniated discs" in his letter to Dr. Lepley. The ALJ's "fail[ure] to marshal that support" hardly matters in this case, however, because the record "overwhelmingly support[s]" his finding that Dr. Lepley's opinion was inconsistent with other medical evidence. *Bishop*, 583 F. App'x at 67.

In August 2010, for example, Dr. Blurton opined that this MRI showed a "mild broad-based disc bulge" without "complicating features" at L4-5 and a "broad-based disc bulge with small central disc protrusion" and "very slight narrowing of the right neural foramen" at L5-S1. R. 264. A few days later, Dr. Lepley noted that the MRI showed "broad based herniated discs but no focal neurologic compression." R. 298–99. He did not comment on the severity of May's herniated discs at that time. *See id.* In February 2011, Dr. Lepley agreed with Dr. Helm that May was not a surgical candidate because the MRI showed only mild degenerative changes. *See* R. 290, 274. It wasn't until Dr. Lepley completed May's third disability form in February 2012—on a routine visit where he documented no objective abnormalities—that he opined May suffered "severe" herniated discs at L4-5 and L5-S1. *See* R. 378–79, 420. These obvious, unexplained conflicts between Dr. Lepley's opinion and May's medical records provided legitimate grounds for the ALJ to discount the opinion. *See Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *3–4 (W.D. Va. Sept. 12, 2014); 20 C.F.R. § 404.1527(c)(4).

Substantial evidence also supports the ALJ's finding that Dr. Lepley's functional "assessments . . . [were] more based on the claimant's reported symptoms and limitations[] rather than on objective findings and diagnostic test results." R. 20. Indeed, Dr. Lepley specifically attributed part of his assessment to May's "estimate" that he could stand or walk "no more than 15 minutes" each day. R. 380. Dr. Lepley also did not explain many of the physical restrictions that he identified on these check-box assessments. *See* R. 378–80. The few ostensibly objective reasons Dr. Lepley did give either mirror May's subjective complaints or conflict with his own findings on routine physical exams. *Compare* R. 380 (noting that May's "objective signs of pain include" joint deformities), *with* R. 348, 384, 396, 404, 415 (documenting "no joint deformity or abnormalities").

18

May counters that he experienced "pain on palpation of the lower paraspinous muscles" during some of Dr. Lepley's physical exams. Pl. Br. 12. The ALJ, however, correctly found that Dr. Lepley's treatment notes contain few abnormal findings on physical exams except when they also discussed May's disability forms. Further, several other examining physicians opined that May's description of his pain conflicted with, or at least was not supported by, his generally unremarkable diagnostic studies from the same time. *See, e.g.*, R. 242, 253, 284, 287, 358. It was up to the ALJ to weigh Dr. Lepley's restrictions against these treatment notes to determine which were more persuasive. *Cooke*, 2014 WL 4567473, at *3–4. Unfortunately for May, the ALJ sided, fairly and consistently with the law, against Dr. Lepley's opinion. *See Craig*, 76 F.3d at 590 (holding that substantial evidence supported ALJ's decision to reject treating physician's conclusory opinion that mirrored the claimant's complaints, but conflicted with the physician's own treatment notes).

May does not point to any medical evidence that arguably entitled Dr. Lepley's functional assessment to greater weight. He simply disagrees with the ALJ's choice between conflicting evidence. *See* Pl. Br. 11–12. This Court cannot second-guess the ALJ when he gave specific and legitimate reasons, supported by substantial evidence in the record, for rejecting a treating-source medical opinion. *Bishop*, 583 F. App'x at 67. Given the persuasive contrary evidence discussed above, I find no error with the ALJ's decision to reject Dr. Lepley's opinion in its entirety.[7] *See id.*

---

[7] May also objects that the ALJ did not explain the weight, if any, that he assigned to Dr. Lepley's opinion that May's severe back pain would cause him to miss more than three days of work each month. *See* Pl. Br. 11–12; R. 64, 380. The ALJ need not expressly weigh each part of a physician's opinion when assessing the claimant's RFC. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Rather, the ALJ's RFC determination must "identify the [claimant's] functional limitations or restrictions and assess his work-related abilities on a function-by-function basis." *Mascio*, 780 F.3d at 636 (citing SSR 96-8p, at *1, *7). His decision

B.      *May's Credibility*

May also argues that substantial evidence does not support the ALJ's credibility finding, which undermines his RFC determination. *See* Pl. Br. 15–17. The regulations set out a two-step process for evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[8] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig*, 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96-7p, at *2, *4. The ALJ

_____

also must include a narrative discussion describing how specific medical facts and nonmedical evidence in the record support "each conclusion" in his RFC determination. An adequate narrative will include the ALJ's reasons for the weight assigned to any material medical opinion. *See id.* at 637; *Harder*, 2014 WL 534020, at *4 (citing SSR 96-8p, at *5).

The ALJ mentioned Dr. Lepley's attendance restriction immediately before he explained why he rejected the physician's "conclusory opinions" about May's limitations. It is sufficiently clear to this Court that the ALJ rejected Dr. Lepley's functional assessment in its entirety because it conflicted with his own treatment notes and seemed "more based on [May's] reported symptoms and limitations" than on the available medical evidence. R. 20. May does not "point to any specific piece of evidence not considered by the [ALJ] that might" entitle Dr. Lepley's attendance restriction to any weight. *Reid*, 769 F.3d at 865 (emphasis omitted). Thus, the ALJ's failure to expressly weigh this particular restriction, if error, was harmless. *See id.*

[8] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 404.1528(a).

cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). Rather, he must consider all the evidence in the record, including the claimant's other statements, his treatment history, any medical-source statements, and the objective medical evidence. 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by specific relevant evidence in the record, for the weight assigned to the claimant's statements. *Eggleston v. Colvin*, No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (citing SSR 96-7p, at *4).

A reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop*, 583 F. App'x at 68 (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio*, 780 F.3d at 640 ("Nowhere . . . does the ALJ explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's [RFC]. The ALJ's lack of explanation requires remand.").

1. *May's Statements*

May filled out a Pain Questionnaire and Adult Function Report in spring 2011. R. 175–85. He reported experiencing "very severe" and constant "aching, stabbing, burning, throbbing, crushing" pain in his lower back that radiated into his hips and legs. R. 182, 184. He also sometimes experienced weakness in his legs. R. 182, 184–85. Bending at the waist, squatting, and sitting, standing, or walking for extended periods exacerbated his pain and weakness. *Id.* The combination of Percocet, Fentanyl, and Neurontin "help[ed] a little bit." R. 185. May also sometimes used a walker or brace around the house and a wheelchair while shopping. R. 181.

May reported that he lived in an apartment with his wife, who had Parkinson's disease. R. 175. They helped each other bathe, fix simple meals, and go shopping or to doctors' appointments once a week. R. 175, 178–79. Mrs. May's granddaughter also helped take care of the couple and their apartment when she could. R. 176.

In September 2012, May testified that he experienced "extreme" and constant stabbing, aching, burning, and radiating pain in his lower back as well as numbness and weakness in his legs. R. 44. He estimated that he could lift five pounds, sit for twenty minutes before needing to stand and stretch, stand for fifteen minutes before needing to sit, and walk fifty feet before needing to stop and rest. *See* R. 45–48. May testified that physical therapy, steroid injections, and "all kinds of pain medication" had not relieved his symptoms and that "a couple of different surgeons" said that they "wouldn't recommend" back surgery. R. 48.

May testified that he still lived with his wife in their single-story, ground-floor apartment. R. 51. He explained that Mrs. May could care for herself despite her Parkinson's disease and recent-onset dementia. R. 51–52. She "just use[d] a walker when she walks, if she goes out." R. 52. They still helped each other cook, wash dishes, and do a "little bit" of household cleaning. *Id.* Mrs. May's granddaughter shopped for the couple's groceries and cleaned their apartment when she had time. R. 52–53.

2. *The ALJ's Findings*

The ALJ found that May's back disorder and obesity "could reasonably be expected to produce some symptoms of the general type" that May reported but that his statements describing the "intensity, persistence, and limiting effects of those symptoms [were] not entirely credible in light of the longitudinal record as a whole." R. 15. The ALJ gave four reasons for rejecting any alleged functional limitations beyond those he credited in concluding that May

could perform light work with certain postural restrictions. *See* R. 21 ("There is nothing in the record to indicate [May] is unable to work with the limitations set forth in the above residual functional capacity.").

First, the ALJ found that "[n]one of the imagery or testing evidence provide[d] objective support for an impairment that could reasonably produce the extent or intensity of [May's] expression of subjective pain." R. 19. He also found that "repeated physical examinations [had] failed to reveal significantly decreased strength, sensation, or range of motion of any extremity, as would be expected" given May's allegation that his back pain caused "significant functional limitations." *Id.* Second, the ALJ found that May's treatment was "generally routine, conservative, and unremarkable" because "there ha[d] been no ongoing treatment by specialists" and May "ha[d] not required emergency room visits or any hospitalizations . . . secondary to his back pain." *Id.* Third, the ALJ found that May made "inconsistent statements" about his limited education and weight gain, which "significantly undermine[d] his credibility." *Id.* Finally, the ALJ "note[d] that it strains credulity that May is not assisting his wife at all, given her condition and the fact that no one else lives with them." *Id.* Earlier in his decision, the ALJ found that May recently "engaged in work-like activity . . . as a companion for his wife with Parkinson's disease," which the VE classified as light semiskilled work.[9] R. 12, 60.

 *3. Analysis*

Substantial evidence supports the ALJ's finding that the available objective medical evidence did not corroborate May's complaints of debilitating back pain and alleged functional limitations. *See Craig*, 76 F.3d at 595 (noting that the claimant's subjective statements "need not

---

[9] A "companion" tends to the personal, domestic, social, and business needs of an "elderly, handicapped, or convalescent" employer. Dep't of Labor, Office of Admin. Law Judges, *Dictionary of Occupational Titles* § 309.677-010 (1977).

be accepted to the extent they are inconsistent with the available evidence, including objective medical evidence of the underlying impairment[] and the extent to which that impairment can reasonably be expected to cause the pain" alleged). But the ALJ cannot reject May's description of his pain for that reason alone. Having "show[n] by objective medical evidence a condition reasonably likely to cause the pain claimed, [May] was entitled to rely exclusively on subjective evidence to prove . . . that his pain is so continuous and/or severe that it prevents him from" performing substantial gainful activity. *Hines*, 453 F.3d at 565.

The ALJ's rationale for rejecting May's subjective statements conflicts with medical evidence that the ALJ discussed elsewhere in his decision, contradicts May's undisputed testimony, and relies on minor discrepancies between statements having little, if anything, to do with May's alleged pain or functional limitations. *See Mascio*, 780 F.3d at 639–40 (finding that the ALJ did not properly analyze the claimant's "statements that her pain is as limiting as she ha[d] alleged" in part because one of the ALJ's three reasons for discrediting her statements had "nothing to do with pain"); *Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence."); *Dankam v. Gonzales*, 495 F.3d 113, 122 (4th Cir. 2007) (questioning whether "minor discrepancies, inconsistencies, or omissions that do not go to the heart of an applicant's asylum claim" could independently support an adverse credibility determination).

For example, the ALJ cited May's failure to obtain "ongoing treatment by specialists" or to seek emergency-room care as a reason to discredit May's description of his pain. R. 19. "An unexplained inconsistency between the claimant's characterization of the severity of [his] condition and the treatment []he sought to alleviate that condition" can weigh against the claimant's credibility. *Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994). Here, however, May

24

regularly visited his primary-care provider, two pain-management specialists, and an orthopedic clinic to treat his chronic back pain. Those providers' notes also show that May sought increasingly aggressive treatment because he felt that the conservative options his doctors recommended did not provide enough relief. *See, e.g.*, R. 240, 246, 290, 294. The ALJ summarized these records when discussing May's treatment history, R. 15–18, but he did not mention them when explaining why May's failure to seek certain kinds of treatment undercut his complaints of debilitating pain. R. 19. This reason is not supported by the record and, thus, undermines the ALJ's credibility finding. *Cf. Hines*, 453 F.3d at 566 (noting that the ALJ cannot "select and discuss only th[e] evidence that favors his ultimate conclusion").

The ALJ also found that May recently performed "work-like activity . . . as a companion for his wife with Parkinson's disease," R. 12, and "that it strains credulity" to think May was "not assisting his wife at all, given her condition and the fact that no one else lives with them." R. 19. May testified that he helped his wife "do a little bit" of the cooking and cleaning, but that she could care for herself and do light chores despite her Parkinson's disease. R. 46, 51–52. He also said several times that Mrs. May's granddaughter helped take care of the couple and their apartment when she could. R. 52–53, 176. Nothing in the record contradicts May's description of what he did—or did not do—to help his wife, and the ALJ did not cite any specific evidence indicating that May's assistance should be considered "work-like activity." R. 12. The ALJ also did not mention that the couple's granddaughter helped them shop and clean even though she did not live with them. The ALJ cannot reject May's undisputed description of his daily activities simply because he thinks it is implausible.[10] *See Hines*, 453 F.3d at 566; *Eggleston*, 2013 WL

---

[10] Notably, the ALJ did not find that May's reported daily activities were inconsistent with his allegation that his chronic severe back pain limited his ability to lift more than five pounds or to sit for more than twenty minutes, stand for more than fifteen minutes, or walk more than fifty

5348274, at *4 (noting that the ALJ's "credibility finding must be grounded in the evidence" and "cannot be based on an intangible or intuitive notion about an individual's credibility").

Finally, the ALJ did not explain why May's "inconsistent" statements about his limited education[11] and "contradictory" statements about his recent weight gain significantly undermined May's allegation that his back pain was so severe or persistent that it prevents him from working. R. 19. "The first reason has nothing to do with pain." *Mascio*, 780 F.3d at 639. The second reason is relevant to May's RFC, but the ALJ did not explain why the record reveals any meaningful contradiction between May's statements and other relevant evidence in the record. *See Hines*, 453 F.3d at 566 (noting that courts will not defer to the ALJ's conclusory finding where "the record, when read as a whole, reveals no inconsistency between" the claimant's statements and other relevant evidence); SSR 96-7p, at *5 (instructing ALJs to "review the case record to determine whether there are any explanations for any variations in the individual's statements about [his] symptoms and their effects").

The ALJ took issue with May's September 2012 testimony "that he currently weighed 270 pounds and had gained 30 pounds in the last 3–4 months" because May's medical records indicated that he weighed 278 pounds four months earlier. *See* R. 19, 39, 49. The ALJ's summary of the medical evidence, however, correctly states that May gained over 15 pounds in one month and gained 21 pounds in the five months between September 2011 and February

---

feet at one time. *See* R. 19, 45–48, 51–52. The VE testified that a person with similar functional limitations would not be able to work full time. *See* R. 66.

[11] When May applied for benefits in spring 2011, he indicated that he "completed" seventh grade in 1983 and did not attend special-education classes. R. 167–68. At his hearing in fall 2012, May testified that he completed sixth grade, including some special-education classes, but "never made it through" seventh grade. R. 40. May also said that he dropped out of school at age 16 after failing seventh grade "a couple [of] times." *Id.* May was 16 in 1983, nearly 30 years before he testified at the administrative hearing. *See* R. 164. The ALJ must explain why such minor inconsistencies concerning May's limited education also undermined May's "statements about his symptoms and their effects." SSR 96-7p, at *5; *see also Dankam*, 495 F.3d at 122.

26

2012. *See* R. 17–18. On its face, the discrepancy between May's recollection and his medical records does little to erode the import of May's testimony—i.e., that he gained a lot of weight in a short time and that his weight contributed to the intensity, persistence, and limiting effects of his chronic back pain. The ALJ did not explain why May's somewhat inaccurate recollection of the former casts any doubt on his statements describing the latter. *See* SSR 96-7p at *5.

The record does not support the ALJ's reasons for questioning May's subjective complaints of pain. Accordingly, the ALJ's credibility assessment is not supported by substantial evidence.

## IV. Conclusion

Although this Court cannot evaluate a claimant's credibility, it does have authority to ensure that the ALJ's credibility finding is consistent with the law and supported by substantial evidence. *Johnson*, 434 F.3d at 659. On this record, I find that the ALJ's decision to reject May's alleged limitations except to the extent reflected in his RFC determination meets neither requirement. *See Mascio*, 780 F.3d at 639–40. The ALJ's error requires remand for the Commissioner to properly evaluate May's credibility as part of her RFC determination.[12] *See id.* Accordingly, the Court will **GRANT** May's motion for summary judgment, ECF No. 29, **DENY** the Commissioner's motion for summary judgment, ECF No. 30, **REVERSE** the Commissioner's final decision, and **REMAND** this case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g). A separate Order will enter.

---

[12] The Commissioner is not required to credit May's statements to the extent that they cannot "reasonably be accepted as consistent with the objective medical evidence and other evidence" in his record. 20 C.F.R. § 404.1529(b). She simply must consider all of the relevant evidence and adequately explain, with supporting cites to specific evidence in the record, how and why she determined May's credibility in analyzing his RFC. *See Mascio*, 780 F.3d at 639–40.

ENTER: May 1, 2015

Joel C. Hoppe
United States Magistrate Judge